IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ERIC MATHESON,

        Plaintiff,                    No. _____

v.

                                           JURY REQUESTED

COMTRUST INC., STERLING
INTERNATIONAL COMMODITIES,
INC., JOHN CIARAMELLA,
STUART A. MEHLER, TIMOTHY
REDDING, JOSHUA SCOTT,
TODD MARSHALL and AARON SLADJOE,

        Defendants.

COMPLAINT

Plaintiff Eric Matheson ("Matheson"), by and through his undersigned attorney, submits

the following as his Complaint against Comtrust, Inc. ("Comtrust"), Sterling International

Commodities, Inc. ("Sterling"), John Ciaramella, Stuart Mehler, Timothy Redding, Joshua Scott

("Scott"), Todd Marshall ("Marshall") and Aaron Sladjoe (collectively "Defendants").

## **INTRODUCTION**

1.     In June 2005, Matheson – a 66-year-old retiree living off his retirement funds – was

enticed to open a speculative and extremely risky futures trading account with a South

Florida futures trading broker (Scott) and his related companies (Sterling and Comtrust).

Through a series of deceptive and misleading representations, material omissions and

improper high-pressure sales tactics, Matheson was duped into sending $95,000 to the

South Florida futures trading broker and his related companies. Matheson's brokers took

control of his account, churned his account and charged Matheson in excess of $77,000 in commissions and fees.

2.     Upon information and belief, the fraud perpetrated upon Matheson was not an isolated occurrence but, rather appears to be part of a well-established and coordinated scheme being perpetrated upon unsuspecting victims across the United States.

## THE PARTIES

3.     Matheson is a 66-year-old individual residing in Memphis, Shelby County, Tennessee. At all times relevant to this action, Matheson was retired and living off his retirement savings.

4.     Comtrust, Inc. is a Florida corporation with its principal place of business in Aventura, Florida.  Comtrust is a registered Futures Commission Merchant ("FCM") with the National Futures Association ("NFA") doing business across the United States, including in Memphis, Tennessee.  Comtrust has been a respondent in at least two (2) Commodity Futures Trading Commission ("CFTC") Reparation cases and is currently a defendant in a federal court lawsuit in Idaho accused of fraud and multiple sales practice violations under circumstances which are almost identical to the fraud and sales practice violations in this case.

5.     John Ciaramella ("Ciaramella") is an individual, and upon information and belief, a resident of the State of Florida.  Ciaramella is a NFA registered principal, officer and director of Comtrust, Inc. and a control person of Comtrust, Inc.  Ciaramella has been the target of at least two (2) NFA regulatory actions involving NFA and CFTC rule violations and inappropriate sales practices, has been a respondent in at least two (2) NFA

2

arbitration proceedings, and has been a respondent in at least eleven (11) CFTC

Reparation cases involving sales practice complaints and/or NFA and CFTC rules

violations.  Ciaramella has been previously sanctioned by the NFA and prohibited by the

NFA from acting in a supervisory capacity in a NFA registered entity.  In violation of

NFA rules and regulations, Ciaramella continues to share an office with Andrew Stern, an

individual who has been permanently barred from the commodity futures industry for

multiple sales practice violations and multiple violations of NFA and CFTC rules and

regulations.  At least two of the companies which Ciaramella and Stern were associated

with were permanently banned from doing business in the futures trading industry.

6.      Stuart A. Mehler ("Mehler") is an individual and, upon information and belief, a resident

of the State of Florida.  Mehler is a NFA registered principal and director of Comtrust,

Inc.  Mehler owns 10% or more of a financial interest in Comtrust and is a control person

of Comtrust, Inc.  Mehler has been a respondent in at least one (1) NFA arbitration

proceeding, and has been a respondent in at least two (2) CFTC Reparation cases.

Mehler has been previously affiliated with Universal Commodity Corporation, JCC Inc.,

Grandview Holding Corp., and Universal Financial Holding, Inc.  Universal Commodity

Corporation has been the target of at least one (1) NFA regulatory action, has been a

respondent in at least four (4) NFA arbitration actions, and has been a respondent in at

least thirty-seven (37) CFTC Reparation cases.  JCC Inc. has been the target of at least

two (2) NFA regulatory actions, has been the target of at least two (2) CFTC regulatory

actions, has been a respondent in at least sixteen (16) NFA arbitration actions, and has

been a respondent in at least eighty-eight (88) CFTC Reparation cases.  Grandview

Holding Corp. has been the target of at least three (3) NFA regulatory actions, has been the target of at least one (1) CFTC regulatory action, has been a respondent in at least three (3) NFA arbitration actions, and has been a respondent in at least ten (10) CFTC Reparation cases.  Several other entities in which Mehler has been affiliated have been involved in numerous NFA and CFTC regulatory actions and numerous NFA arbitration and reparation proceedings involving multiple sales practice violations.

7.     Timothy Redding ("Redding") is an individual, and on information and belief, a resident of the State of Florida.  Redding is a NFA registered principal and President of Comtrust, Inc.  Redding owns 10% or more of a financial interest in Comtrust and is also a control person of Comtrust, Inc.

8.     Sterling is a Florida corporation doing business in Pompano Beach, Florida.  Sterling is a NFA registered Introducing Broker ("IB") doing business across the United States, including in Memphis, Tennessee.  Sterling has been a respondent in at least one (1) CFTC Reparation proceeding.

9.     Todd Marshall ("Marshall") is an individual and, on information and belief, a resident of the State of Florida.  Marshall is the President of Sterling and a principal and control person of Sterling.  Marshall was Joshua Scott's supervisor and manager, and Marshall was responsible for supervising Scott and ensuring that Scott complied with applicable NFA and CFTC rules and regulations.  For a period of time, Marshall controlled Matheson's account and Marshall did business with Matheson in Tennessee regarding Matheson's account.  Marshall has been the target of at least one (1) NFA regulatory action and was sanctioned and fined by the NFA for violating the NFA's sales practice

rules and the NFA's general rules of business conduct.

10.     Aaron Sladjoe ("Sladjoe") is an individual and, on information and belief, a resident of
        the State of Florida.  Sladjoe is a principal and a control person of Sterling.  As a
        principal of Sterling, Sladjoe is responsible for ensuring that Sterling's employees and
        brokers, including Marshall and Scott, complied with applicable NFA and CFTC rules
        and regulations.

11.     Joshua Scott ("Scott") is an individual, and on information and belief, a resident of the
        State of Florida.  Scott was a former NFA registered sales agent at Sterling.  Scott has
        been a respondent in at least one (1) CFTC reparation case.

### JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331
        and 1332, 7 U.S.C. §§ 1 et seq., and 28 U.S.C. § 1367.

13.     Venue is proper in the Western District of Tennessee pursuant to 28 U.S.C. § 1391(a)(2)
        and (b)(2) because a substantial part of the events giving rise to the claims described
        herein occurred in the Western District of Tennessee.

### FACTS

14.     Mr. Matheson is a 66-year-old retired man living in Memphis, Tennessee.  Matheson
        worked for 12 years at Mayer Meyers Paper Company as a purchasing manager and 28
        years at Sears as a merchandise manager.  Matheson and his wife live off his retirement
        savings.

15.     In June 2005, Matheson received a cold call from Joshua Scott, a representative of
        Sterling, at his home in Memphis, Tennessee.  Scott solicited Matheson to open a futures

and options trading account. Matheson told Scott that he was retired, had very little income, that he and his wife were living off his retirement funds, and that he could not afford to lose any of his retirement money.

16.     Scott told Matheson that he was an experienced options and futures trader, that he understood Matheson's risk tolerances, that he never lost money for his clients and that most of his clients doubled their investments in a very short period because of Scott's expertise and experience in trading options on futures contracts and his knowledge of the commodity markets.

17.     Scott stressed and repeatedly told Matheson that he needed to act quickly to get into the commodity market and that he needed to invest immediately to take advantage of the hot commodities markets in order to make money. Scott stressed and repeatedly told Matheson that if he delayed in opening an account and sending money to Scott and his companies he would miss out on the opportunity to make a lot of money.

18.     Scott told Matheson that his account would grow so fast from the profits he would earn on his investments that any commissions for trading would be covered by the profits he would be making on the trades.

19.     Scott told Matheson that he has been very successful financially trading futures and that Scott's goal in trading futures was not to make money for himself because this was primarily a hobby for Scott. Scott repeatedly told Matheson that all of his clients were making significant profits trading options on futures contracts and that Matheson should join these other customers in making money.

20.     Matheson told Scott that he could not afford to lose any of his retirement money and was

not interested in opening a futures trading account.  However, Scott persisted in calling
Matheson in Memphis over the next days and weeks and continued to use the aggressive,
misleading and high pressure sales tactics described herein to entice Matheson into
opening a futures trading account.

21.     Scott did not fully disclose to Matheson the extreme risks associated with trading options
        on futures and the inherent risks associated with commodity trading.  Scott did not reveal
        to Matheson that due to the high commission rates he was going to be charged for each
        individual options contract purchased or sold, Matheson's had little or no chance of ever
        making any money investing in options on futures contracts.  Matheson was never told
        that (1) there was a significant chance that his options would expire worthless; (2) current
        events were already factored into the price of commodity options; (3) a majority of
        Sterling's customers were losing money on their investments and that Sterling's
        customers' investments were being consumed by excessive commission charges; (4)
        several employees and persons associated with Comtrust and Sterling, including
        Ciaramella, Mehler, Marshall and Stern, had worked for a string of investment firms that
        were previously sanctioned and fined for sales fraud, illegal sales practices and NFA and
        CFTC rules violations related to options and futures trading; and (5) that Ciaramella's
        current office mate and long-time business partner, Andrew Stern, had been permanently
        banned from the futures industry for fraudulent sales practices.  If Matheson had known
        this information he would not have opened an account or invested with Comtrust and
        Sterling.

22.     Scott did not disclose that a large majority of Sterlings' customers did not make a profit

7

trading options on futures contracts and that a majority of customers lost significant amounts of money trading options on futures contracts.  Scott did not disclose that a majority of Matheson's money would be used to pay commission to Defendants and that the vast majority of his funds would not be available for investments.

23. With respect to the misrepresentations and omissions set forth above, Scott knew the statements he was making to Matheson were false and misleading.  Scott (with encouragement of the Sterling's management and Sterling Control Persons) was motivated to make these false and misleading statements and omissions to entice Matheson to send Defendants as much money as possible so that Scott and Marshall (with the encouragement of the Sterling Control Persons) could churn Matheson's account and reap enormous amount of money from outrageous commission charges.

24. Relying on the statements and false promises from Scott, Matheson was persuaded to open a futures account.  Within a few days of agreeing to open an account, Matheson received a package of forms from Scott that he was instructed to complete and sign.  The terms of the agreements were never explained to Matheson.  None of the Defendants explained the consequences of Matheson signing the forms and Matheson never fully understood what he was agreeing to.  Some of the account opening forms were sent from Sterling and other forms were sent from Comtrust.  The close business relationship between Comtrust and Sterling was never explained or disclosed to Matheson.

25. On or about June 20, 2005, Matheson was instructed by Scott to send $15,000 to Comtrust to fund trades that Scott intended to make on behalf of Matheson.

26. Upon Comtrust's receipt of the funds, Scott immediately purchased a number of

commodity option contracts valued at approximately $10,000.  These trades generated $4,190 in commissions for Defendants in three (3) days.  Although Matheson was sent a commission rate disclosure form, he was not aware that more than 40% of his money was going to be used to pay commissions to Defendants and that his initial investment would have to generate a return in excess of 200% for Matheson to make a profit.

27.    Based on information and belief, the excessive commissions charged Matheson for the trades were split between Comtrust and Sterling in a proportion that does not conform to industry standards.  Comtrust was being rewarded by Sterling for executing trades that Comtrust knew or should have known were not suitable or appropriate for a customer with Matheson's background, financial situation and trading inexperience.

28.    When Scott told Matheson that he was going to be buying options on several futures contracts, Scott told Matheson that he needed to talk to "his compliance department."  Scott told Matheson that when the compliance person asks Matheson any questions, Matheson should only answer "Yes" or "No" to the questions and that Matheson should not ask any questions or try to elaborate on any of his answers.  The "compliance department" turned out to be defendant Marshall.

29.    Soon thereafter, Matheson began receiving monthly account statements and confirmations from Comtrust that he could not understand.  Matheson called and e-mailed Scott seeking his assistance in reading the account statements he received from Comtrust but these requests for assistance and explanations were generally ignored by Scott.  When Matheson began e-mailing Scott with questions about his account and the trading occurring in the account, Scott instructed Matheson to stop sending e-mails because they

were being reviewed by the compliance department and causing problems for Scott.

30.     In mid-July 2005, Matheson received an urgent call from Scott wherein Scott told
Matheson that the commodities markets were "taking off" because of weather problems
and that Matheson needed to send Scott and Comtrust another $60,000 so that he could
"get in" on the soaring commodity markets.  Scott told Matheson that his "analysts" had
determined that the commodities markets were going to "take off" because of the recent
weather problems and that Matheson could make a lot of money trading options on
soybean futures contracts if he acted quickly and invested in options on soybean futures
contracts.  Scott again repeatedly stressed that Matheson needed to act quickly to take
advantage of the rising market and that his profits would be enormous if he acted
immediately and sent the requested $60,000.

31.     Matheson told Scott he could not afford to lose any more money and Scott promised him
that he would make money in this "hot" market if he acted quickly.  Matheson felt he was
being pressured into sending the $60,000 to Scott.  On or about July 29, 2005, Matheson
succumbed to Scott's pressure and illegal sales tactics and agreed to send Scott and
Comtrust an additional $60,000.  Even before receiving the funds from Matheson, Scott
began buying and selling options on futures contracts, and generating outrageous
commissions for himself.  Scott had actual control and de facto control of Matheson's
account.  In the months of July, August and September 2005, Scott generated in excess of
$40,000 in commissions.

32.     In early August 2005, Matheson received yet another call from Scott wherein Scott again
asked Matheson to send money to Comtrust for Scott to trade options on futures

contracts.  Specifically, Scott told Matheson he needed to immediately send an additional $20,000 to Comtrust to "get in" on the rising markets.  Scott falsely told Matheson that these trades would make enough money to payoff the commissions already incurred and to start making a profit for Matheson's account.  Again, Matheson felt strong-armed and pressured into sending the money.  Similar to his earlier statements, Scott told Matheson that he needed to send the money immediately to Comtrust and Scott assured Matheson that he was going to make a profit for Matheson.

33.   Similar to Scott's prior conduct, Scott immediately purchased a number of options on futures contracts again generating outrageous commissions for himself but leaving Matheson with no real possibility to make any money much less recover the commissions paid to Defendants.

34.   In the fall of 2005, Matheson learned that Scott no longer worked at Sterling and that Todd Marshall would be handling his account.  Similar to Scott's "handling" of the account, Marshall took actual and de facto control over Matheson's account and he continued to buy and sell futures contracts in Matheson's account to generate outrageous commissions.  Many of the trades executed by Marshall were made without Matheson knowledge and/or understanding of the trades and were, therefore, unsuitable and unauthorized.

35.   To placate Matheson's questions about why he was not receiving checks from Sterling and Comtrust for the "profits" he was promised by Scott and Marshall, Marshall told Matheson that he would start sending him monthly checks from the profits his account was generating.  Marshall did, in fact, arrange to have monthly checks sent to Matheson

but instead of these checks being paid from profits, Marshall was simply liquidating positions in Matheson's account and sending Matheson back his own principal investment funds.  Marshall falsely represented to Matheson that the money he was receiving was from "profits" in order to hide from Matheson the true facts surrounding his account.

36.     In total, Matheson sent Comtrust $95,000 from June 2005 to August 2005.  During the time Matheson had accounts at Sterling and Comtrust, Defendants charged Matheson approximately $77,000 in commission and fees. For Matheson to ever make a profit on his principal investment of approximately $18,000 ($95,000 less $77,000 in commission and fees), Matheson's investments would have needed to generate in excess of 400% returns.  The amount of return on investments necessary for Matheson to ever make a profit was not disclosed to Matheson.

37.     Pursuant to the common law and NFA and CFTC rules and regulations, Comtrust, the Comtrust Control Persons, Sterling, Scott, Marshall and the other Sterling Control Persons had a duty and obligation to conduct a reasonable inquiry into Matheson's background, investment experience and financial situation to determine if trading options on futures contracts was suitable and appropriate for Matheson.  Comtrust, the Comtrust Control Persons, Sterling, Scott, Marshall and the other Sterling Control Persons breached their common law duties and obligations by failing to conduct a reasonable inquiry into Matheson's background, investment experience and financial situation.

38.     Pursuant to the common law and NFA and CFTC rules and regulations, Comtrust and the Comtrust Control Persons had a duty to conduct a reasonable inquiry into the trades being

12

submitted by Sterling, Scott and Marshall to ensure that Sterling was not engaging in fraudulent and/or improper sales practices with respect to Matheson and that Scott and Marshall were not churning Matheson's account.

39.    As officers, principals and supervisors of Sterling, Marshall and Sladjoe had common law and NFA and CFTC duties and obligations to properly train, supervise and manage Scott to ensure that he complied with NFA and CFTC rules and regulations and that he did not engage in the kinds of unfair sales practices described herein.  Sterling was required to have procedures in place to ensure that supervisory personnel know and understand the the firm's supervisory procedures.  Sterling, Marshal and Sladjoe failed to properly supervise and manage Scott, and failed to have in place appropriate procedures that would have prevent the kinds of unfair sales practices described herein.

40.    At the time Scott was making misrepresentations and material omissions to Matheson and engaging in the unfair sales practices alleged herein, Scott was an employee of Sterling. Sterling is liable for Scott's misconduct under the doctrine of respondeat superior.

41.    At the time Marshall was making misrepresentations and material omissions to Matheson and engaging in the unfair sales practices alleged herein, Marshall was an employee of Sterling.  Sterling is liable for Marshall's misconduct under the doctrine of respondeat superior.

## COUNT I - COMMON LAW FRAUD

42.    Matheson incorporates herein paragraphs 1 through 41 as if repeated verbatim.

43.    Defendants willfully, knowingly, and/or recklessly engaged in fraudulent conduct by (i) making material misrepresentations and omissions to Matheson regarding their trading

13

activities, business practices and backgrounds, and (ii) failing to disclose the true facts to Plaintiff.

44.     Matheson was unaware of the true facts when he opened an account with Comtrust and Sterling and sent them funds for investments.  Matheson would not have opened an account with Comtrust and Sterling, and certainly would not have sent them any money if he had known the true facts.

45.     As a result of Defendants' fraudulent conduct, Matheson was deceived and tricked into opening a futures trading account, overcharged commissions, deceived and financially damaged.

46.     Matheson is entitled to recover from Defendants compensatory damages in an amount to be proven at trial, including pre-judgment interest.

47.     As a result of the fraud and willful misconduct of Defendants, Matheson is also entitled to recover punitive damages.

## COUNT II - NFA AND CFTC RULE VIOLATIONS

48.     Matheson incorporates herein paragraphs 1 through 47 as if repeated verbatim.

49.     Pursuant to NFA Compliance Rule 2-2, Defendants are prohibited from, among other things, cheating, defrauding or deceiving, or attemptinng to cheat, defraud or deceive, any commodity futures customer.  Defendants violated NFA Compliance Rule 2-2 in their dealings with Matheson.

50.     Pursuant to NFA Compliance Rule 2-4, Defendants were obligated to "observe high standards of commercial honor and just and equitable principles of trade in the conduct of their commodity futures business."  Defendants violated NFA Compliance Rule 2-4 in

14

their dealings with Matheson.

51.   Pursuant to NFA Compliance Rule 2-29, Defendants are prohibited from making any communication with the public which (1) operates as a fraud or deceit, or (2) employs or is part of a high-pressure approach.  Defendants violated NFA Compliance Rule 2-29 in their dealings with Matheson.

52.   Pursuant to NFA Compliance Rule 2-30, Defendants are required to obtain sufficient information from a potential customer to determine if futures trading is appropriate for that person.  Defendants violated NFA Compliance Rule 2-30 in their dealings with Matheson.

53.   Pursuant to NFA Compliance Rule 2-36, Defendants are prohibited from, among other things, cheating, defrauding or deceiving, or attempting to cheat, defraud or deceive, any commodity futures customer with respect to the sale of any futures or options on foreign currency transactions.  Defendants were also obligated to "observe high standards of commercial honor and just and equitable principles of trade in the conduct of their foreign currency futures and options business."  Defendants violated NFA Compliance Rule 2-36 in their dealings with Matheson.

54.   Pursuant to Commodity Exchange Act, 7 U.S.C. 6(b), Defendants are prohibited from, among other things, cheating, defrauding or deceiving, or attempting to cheat, defraud or deceive, any commodity futures customer.  Defendants violated Commodity Exchange Act, 7 U.S.C. 6(b) in their dealings with Matheson.

55.   As a result of Defendants' violations of NFA and CFTC rules, Matheson was deceived and tricked into opening a futures trading account, overcharged commissions, deceived

15

and financially damaged.

56.     Matheson is entitled to recover from Defendants compensatory damages in an amount to

        be proven at trial, including pre-judgment interest.

57.     As a result of the fraud and willful misconduct of Defendants, Matheson is also entitled

        to recover punitive damages.

### COUNT III - TENNESSEE CONSUMER PROTECTION ACT

58.     Matheson incorporates herein paragraphs 1 through 57 as if repeated verbatim.

59.     Defendants' conduct herein violates the Tennessee Consumer Protection Act, Tenn. Code

        Ann. §§ 47-18-101, et seq. ("TAPA"), in that Defendants have engaged in a scheme to

        unfairly and deceptively affect the conduct of commerce in the State of Tennessee.

60.     More specifically, and without limitation, Defendants conduct described herein

        constitutes unfair practices and violates numerous provisions of the TAPA, including but

        not limited to Tenn. Code Ann. §§ 47-18-104 (a), (b) (5), (7), and (27).

61.     Defendants engaged in the unfair practices described herein to maximize their profits at

        the direct expense of and harm to Matheson, while at the same time subjecting Matheson

        to unreasonable and unnecessary risks.

62.     As a result of Defendants' unfair and deceptive acts and practices described herein,

        Matheson is entitled to actual damages pursuant to Tenn. Code Ann. § 47-18-109, in an

        amount to be proven at trial, for, among other things, all monies paid by Matheson to

        Defendants.

63.     Defendants' unfair and deceptive acts and practices described herein were done willfully,

        knowingly and recklessly, and Matheson is entitled to an award three (3) times the actual

damages pursuant to Tenn. Code Ann. § 47-18-109(a)(3).

64. Matheson is also entitled to an award of reasonable attorneys' fees and litigation costs pursuant to Tenn. Code Ann. § 47-18-109(e).

## COUNT IV - TENNESSEE SECURITIES ACT VIOLATIONS

65. Matheson incorporates herein paragraphs 1 through 64 as if repeated verbatim.

66. In contacting Matheson in Memphis, Tennessee and soliciting him to purchase options on futures contracts in Tennessee, Defendants are subject to the provisions of the Tennessee Securities Act, Tenn. Code Ann. §§ 48-2-101 et seq.

67. Defendants' conduct described herein violates the anti-fraud provisions of the Tennessee Security Act, Tenn. Code Ann. § 48-2-121.

68. Pursuant to Tenn. Code Ann. § 48-2-122, Matheson is entitled to recover from Defendants compensatory and exemplary damages, and costs, including reasonable attorneys' fees.

69. Pursuant to Tenn. Code Ann. § 48-2-122(g), the Comtrust Control Persons and Sterling Control Persons are liable to Matheson for aiding and abetting Scott's and Marshall's violations of the Tennessee Securities Act.

## COUNT V - UNJUST ENRICHMENT

70. Matheson incorporates herein paragraphs 1 through 69 as if repeated verbatim.

71. Defendants were unjustly enriched in any and all transactions wherein Matheson was overcharged commissions.

72. Defendants should be ordered to disgorge all unjust charges, commissions and all money unjustly received from Matheson.

17

## COUNT VI - NEGLIGENCE

73.   Matheson incorporates herein paragraphs 1 through 72 as if repeated verbatim.

74.   Among other things, Defendants owed Matheson a duty of care not to deceive him, not to use improper and strong arm sales tactics, not to churn his account, not to expose him to improper risks, not to make trades in his account without his knowledge or full understanding of what was being done in his account, and not to violate NFA and CFTC rules and regulations.

75.   Defendants breached their duties to Matheson and Defendants and were not in conformance with reasonable professional care and competence, and accepted practice standards in the futures industry.

76.   Matheson was damaged by Defendants' negligence.

77.   Defendants are therefore liable to Matheson for all losses he sustained, plus pre-judgment interest.

78.   Because Defendants' conduct was done knowingly or in reckless disregard of Matheson's rights, Matheson is entitled to punitive damages.

## COUNT VII - NEGLIGENT MISREPRESENTATION

79.   Matheson incorporates herein paragraphs 1 through 78 as if repeated verbatim.

80.   Defendants negligently made misleading misrepresentations and/or omissions to Matheson concerning his futures account, the trading that would occur in his futures trading account and the profits he should expect from trading in options on futures contracts.

81.   Defendants intended Matheson to rely on the representations they were making regarding

18

his futures trading account.

82. Matheson justifiably relied on the accuracy of Defendants' representations and statements regarding his futures trading account.

83. As a direct and proximate cause of Defendants' willful, intentional and negligent conduct described herein, Matheson has suffered damages and is entitled to compensatory and punitive damages, attorneys' fees, interests and costs.

## COUNT VIII - CONSTRUCTIVE FRAUD

84. Matheson incorporates herein paragraphs 1 through 83 as if repeated verbatim.

85. Defendants acts, statements and omissions with respect to opening a futures trading account, soliciting funds for such account and violating the common law and NFA and CFTC rules and regulations, were prejudicial to the public welfare and were not clearly resolvable into mere accident or mistake. Under constructive fraud, it is irrelevant whether, in the opinion of Defendants, their conduct was justifiable, allowable or allegedly unconnected with any selfish, evil design or intent to defraud.

86. In Defendants' dealings with Matheson, Defendants have committed a constructive fraud.

87. As a direct and proximate cause of Defendants willful and intentional conduct described herein, Matheson has suffered damages, including but not limited to being overcharged commissions and being defrauded out of his money.

88. As a direct and proximate cause of Defendants' constructive fraud, Matheson is entitled to compensatory and punitive damages, attorneys' fees, interests and costs.

## COUNT IX - BREACH OF FIDUCIARY DUTIES

89. Matheson incorporates herein paragraphs 1 through 88 as if repeated verbatim.

19

90.     Defendants owed to Matheson fiduciary duties of good faith, honesty, competence, and diligence.  Defendants breached these duties.

91.     Plaintiff was damaged by Defendants' fiduciary breaches.

92.     Defendants are therefore liable to Plaintiff for all losses he sustained, plus pre-judgment interest.

93.     Plaintiff is also entitled to recover punitive damages in an amount sufficient to punish Defendants' willful misconduct and to deter others from such conduct.

## COUNT X - CHURNING

94.     Matheson incorporates the allegations of paragraphs 1 through 93 as if stated herein verbatim.

95.     As described herein, Defendants ignored the lack of experience, needs and objectives of Matheson in making and recommending trades in Matheson's account.  Matheson reasonably relied on the Defendants' recommendations being made by Defendants with respect to the type and frequency of trades in his account.  Defendants exercised control over the level and frequency of trading in Matheson's account (including de facto control).

96.     Defendants violated Section 4B of the Commodity Exchange Act by engaging in excessive trading in Matheson's account in light of Matheson's trading objectives and experience for the purpose of generating commissions rather than protecting Matheson's interests.

97.     Defendants acted with intent to defraud or in reckless disregard of Matheson's interest for the purpose of generating commissions.

98.     Matheson was damaged by Defendants conduct in an amount to be proven at trial.

## COUNT XI  - ACCOUNTING OF COMMISSIONS

99.     Matheson incorporates the allegations of paragraphs 1 through 98 as if stated herein verbatim.

100.    Of the $95,000 Matheson sent to Defendants for investment purposes, Matheson was charged approximately $77,000 in commissions.  These commissions were split and paid to the various Defendants.

101.    The amounts of commissions received by the various Defendants did not conform to industry standards for the splitting and payment of commissions.

102.    Matheson seeks an accounting of all commissions paid by Matheson to Defendants.

## COUNT XII - FAILURE TO SUPERVISE

103.    Matheson incorporates the allegations of paragraphs 1 through 102 as if stated herein verbatim.

104.    Defendants had a common law and statutory duty to properly supervise Scott and Marshall to prevent them from violating NFA and CFTC rules and regulations and to prevent Scott and Marshall from violating Matheson's common law and statutory rights.

105.    Defendants' managers, supervisors and control persons failed to properly supervise Scott and Marshall.

106.    Defendants had a common law and statutory duty to have in place proper supervisory practices, procedures and controls to prevent Scott and Marshall from violating NFA and CFTC rules and regulations and to prevent Scott and Marshall from violating Matheson's common law and statutory rights

107.   Defendants failed to have in place proper supervisory practices, procedures and controls.

108.   As a direct result of Defendants' failures to properly supervise Scott and Marshall, Matheson was damaged in an amount to be proven at trial.

## JURY TRIAL DEMAND

109.   Matheson demands his claims and actions against Defendants in this matter be heard by a jury.

## PRAYER FOR RELIEF

110.   Matheson respectfully requests that the Court award him compensatory and punitive damages in such amount as may appear fair, reasonable and warranted by the Court, together with interest and costs, including but not limited to:

a.   all monies provided by Matheson to Defendants;

b.   treble damages under the Tennessee Consumer Protection Act;

c.   punitive damages in an amount of $2.0 million to punish Defendants law for their fraudulent and deceptive conduct;

d.   reasonable attorneys' fees and reasonable and necessary expert witness fees and court costs incurred in instituting and prosecuting this action as provided for in the Tennessee Consumer Protection Act and/or the Tennessee Securities Act; and

e.   all such other sums, costs, expenses and/or damages, legal or equitable and however denominated or characterized, to which Matheson may be entitled in the judgment of the Court.

Dated:  Memphis, Tennessee

December 7, 2006

Respectfully submitted,


  /s/ Scott T. Beall
Scott T. Beall  (#013711)
LAW OFFICES OF SCOTT T. BEALL
6800 Poplar Ave.
Atrium I, Suite 215
Memphis, Tennessee  38120
Phone:  901-681-0500
Fax:  901-374-9291
sbeall@bealllaw.com

Attorney for Plaintiff Eric Matheson

23